```
================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
----------------------------------------------------------------
No. 106
In the Matter of State of New
York,
            Respondent,
        v.
Dennis K.,
            Appellant.
------------------------------
No. 107
In the Matter of State of New
York,
            Respondent,
        v.
Anthony N.,
            Appellant.
------------------------------
No. 108
In the Matter of State of New
York,
            Respondent,
        v.
Richard TT.,
            Appellant.
```

Case No. 106:
        Timothy M. Riselvato, for appellant.
        Karen W. Lin, for respondent.

Case No. 107:
        Mark C. Davison, for appellant.
        Jonathan D. Hitsous, for respondent.

Case No. 108:
        Shannon Stockwell, for appellant.
        Allyson B. Levine, for respondent.

PIGOTT, J.:

In Matter of State of New York v Donald DD. (24 NY3d 174 [2014]), we held that, in a trial conducted pursuant to Mental Hygiene Law article 10, "evidence that a respondent

- 1 -

suffers from antisocial personality disorder (ASPD) cannot be used to support a finding that he [or she] has a mental abnormality as defined by Mental Hygiene Law § 10.03 (i), when it is not accompanied by any other diagnosis of mental abnormality" (id. at 177 [emphasis supplied]).

Like the respondent in Donald DD., respondents Dennis K., Anthony N. and Richard TT. have been diagnosed with ASPD.[1] Unlike the respondent in Donald DD., however, they have been diagnosed with conditions, diseases and/or disorders in addition to ASPD. Notwithstanding this significant distinction, respondents argue that our holding in Donald DD. warrants the dismissal of the petitions brought against them pursuant to Mental Hygiene Law § 10.06 (a). For the reasons that follow, we reject that argument and hold that in each of the Mental Hygiene

---

[1] An "essential feature of [ASPD] is a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood" (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 659 [5th ed 2013] [hereafter "DSM-V"]). There are four diagnostic criteria supporting the diagnosis: (1) the person is over the age of 18; (2) there is evidence that the person had an onset of conduct disorder before the age of 15; (3) the occurrence of antisocial behavior did not "exclusively occur" during the course of bipolar disorder or schizophrenia; and (4) the person has displayed "[a] pervasive pattern of disregard for and violation of the rights of others, occurring since the age of 15" (id.) With regard to the last criterion, the person must display three or more of the following seven traits: failure to conform to social norms; deceitfulness; impulsivity; irritability and aggressiveness; reckless disregard for one's safety or that of others; consistent irresponsibility; and lack of remorse (see id.).

Law article 10 proceedings, "the evidence, considered in the light most favorable to the State, was sufficient to support the . . . verdict[s]" that respondents suffered from a "mental abnormality" as defined in the Mental Hygiene Law (Matter of State of New York v John S., 23 NY3d 326, 348 [2014] [citations omitted]).  Accordingly, in Matter of State of New York v Dennis K. and Matter of State of New York v Anthony N., we affirm the Appellate Division orders.  In Matter of State of New York v Richard TT., we affirm the order of the Appellate Division and answer the certified question in the negative.

I.

Mental Hygiene Law article 10 is designed to reduce the risks posed by, and to address the treatment needs of, sex offenders who suffer from mental abnormalities that predispose them to commit repeated sex crimes (Mental Hygiene Law §§ 10.01 [b], 10.03 [i]).  The law defines "mental abnormality" as "a congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct" (Mental Hygiene Law § 10.03 [i]).  Thus, not only must the State establish by clear and convincing evidence the existence of a predicate "condition, disease or disorder," it must also link that "condition, disease or disorder" to a person's

predisposition to commit conduct constituting a sex offense and to that person's "serious difficulty in controlling such conduct."

Substantive due process requires that evidence of a respondent's "serious difficulty in controlling behavior . . . when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case" (Kansas v Crane, 534 US 407, 413 [2002]).  When considering Mental Hygiene Law article 10 petitions, courts must be sure that civil commitment is not utilized as punishment or deterrence, but, rather, to serve the aims of providing the necessary treatment to sex offenders while concomitantly protecting the public from potential sexual assaults (see generally Mental Hygiene Law § 10.01 [a]).

II.

As evidenced by these current appeals, a significant issue that repeatedly arises is what constitutes legal sufficiency of a mental abnormality for purposes of article 10. We addressed that issue in Matter of State of New York v Shannon S. (20 NY3d 99 [2012]), where the respondent was diagnosed with,

among other things, ASPD and paraphilia NOS.[2]  The particular

paraphilia with which the respondent was diagnosed was

"hebephilia," which is defined as an attraction to pubescent

girls, and is not contained in the American Psychological

Association's Diagnostic and Statistical Manual of Mental

Disorders (DSM) (id. at 105).

In Shannon S., we rejected the respondent's primary

contention that, to qualify as a mental abnormality under the

Mental Hygiene Law, a diagnosis of a mental disease or disorder

must be listed in the DSM, recognizing that section 10.03 (i)

"does not reference or require that a diagnosis be limited to

mental disorders enumerated within the DSM" (id. at 105-106).  We

also found that a diagnosis of paraphilia NOS is "a viable

predicate mental disorder or defect that comports with minimal

due process" such that any issue pertaining to its reliability as

a predicate condition is "a factor relevant to the weight to be

_____

[2]  As we noted in Donald DD., "'[t]he essential features of
a [p]araphilia are recurrent, intense sexually arousing
fantasies, sexual urges, or behaviors generally involving 1)
nonhuman objects, 2) the suffering or humiliation of oneself or
one's partner, or 3) children or other nonconsenting persons that
occur over a period of at least 6 months'" (Donald DD., 24 NY3d
at 179 n 1, quoting American Psychiatric Association, Diagnostic
and Statistical Manual of Mental Disorders 566 [4th ed Text Rev.
2000] ["DSM-IV-TR"]).  Paraphilia NOS is a category that "is
included for coding Paraphilias that do not meet the criteria for
any of the specific categories," such as, among other things,
"telephone scatologia (obscene phone calls), necrophilia
(corpses), partialism (exclusive focus on part of body),
zoophilia (animals), coprophilia (feces), klismaphilia (enemas),
and urophilia (urine)" (DSM-IV-TR, at 576).

attributed to the diagnosis, an issue properly reserved for resolution by the factfinder" (<u>id.</u> at 107 [citations omitted]). Based on the particular facts of <u>Shannon S.</u>, we concluded that there was an adequate record to assess the paraphilia NOS diagnosis and we found no basis to disturb the affirmed findings of fact of Supreme Court (<u>see</u> <u>id.</u> at 107-108).

Two years later, we observed in <u>Donald DD.</u> "that ASPD establishes only a general tendency toward criminality, and has no necessary relationship to a difficulty in controlling one's sexual behavior" (<u>Donald DD.</u>, 24 NY3d at 191). Noting that the expert testimony and statistics indicated that well over half of the prison population (and in some instances up to 80% of incarcerated individuals) could be diagnosed with ASPD, we concluded that an ASPD diagnosis, by itself "simply does not distinguish the sex offender whose mental abnormality subjects him to civil commitment from the typical recidivist convicted in an ordinary criminal case" (<u>id.</u> at 189-190). Absent evidence of an "independent mental abnormality diagnosis," evidence of ASPD, coupled with testimony concerning the sex crimes that Donald DD. had committed, was insufficient to support Supreme Court's finding of mental abnormality (<u>id.</u> at 191). We explained that our holding did not conflict with <u>Shannon S.</u> because the paraphilia NOS diagnosis in that case, "whatever its strength or weakness as an evidentiary matter, [wa]s, at the very least, <u>potentially</u> <u>relevant</u> to a finding of predisposition to conduct

constituting a sex offense" and that the same could not be said of ASPD (id. [emphasis supplied]).

Finally, in Matter of State of New York v Kenneth T., the companion case to Donald DD., the State's psychologist testified that Kenneth T.'s disorders of ASPD and paraphilia NOS, together, predisposed him to the commission of conduct constituting a sex offense and resulted in his having serious difficulty controlling that conduct (see Donald DD., 24 NY3d at 178-179). We acknowledged that "[p]araphilia NOS is a controversial diagnosis" but declined to overrule Shannon S.'s holding that such a diagnosis was sufficient to support a finding of mental abnormality, noting that Kenneth T. had not made a motion for a Frye hearing to challenge the general acceptance of that diagnosis in the scientific community (id. at 187).

In Kenneth T., we assumed for the sake of argument that paraphilia NOS constituted a condition that met the "predisposition" prong of section 10.03 (i), but nonetheless held that the State failed to establish by clear and convincing evidence that Kenneth T. had "'serious difficulty in controlling' his sexual misconduct within the meaning of section 10.03 (i)" (id.). We concluded that testimony by the State's psychologist that Kenneth T. had carried out offenses that allowed for his identification by the victims, and that he had attempted a second rape after having served a lengthy prison sentence for the first offense, was insufficient to establish the "serious difficulty"

prong of section 10.03 (i) (id.).  While acknowledging that sex offenders are not known for their self-control, we stated that "it is rarely if ever possible to say, from the facts of a sex offense alone, whether the offender had great difficulty in controlling his urges or simply decided to gratify them" (id. at 188).  We did not delineate "from what sources sufficient evidence of a serious difficulty controlling sex-offending conduct may arise," but noted that "[a] detailed psychological portrait of a sex offender would doubtless allow an expert to determine the level of control the offender has over his sexual conduct" (id. at 188).

Having summarized our relevant precedent concerning legal sufficiency in Mental Hygiene Law article 10 proceedings, we now consider the evidence presented in each of the following appeals.

### III.

#### *Dennis K.*

Respondent Dennis K. has committed numerous sexual offenses against female victims.  In June 1975, when he was 15 years old, he, along with three members of his gang, raped a 19-year-old woman.  Two days later, with three accomplices in tow, he raped and robbed a 25-year-old woman.  As a result of his commission of these offenses, he was convicted of numerous crimes, including rape, sodomy and sexual abuse, all in the first degree.  He was adjudicated a youthful offender and sentenced to

a term of 18 months to 3 years in state prison.  In October 1977, two months after being released on parole, respondent, along with another person, held a woman captive for over an hour, raped her twice, assaulted her with a bottle and stole her money and jewelry.  After a jury trial, he was convicted of, among other crimes, two counts of rape in the first degree, and was sentenced to 8 1/3 to 25 years' imprisonment.  He was released on parole in 1989.  In April 1992, three years after his release, and while still on parole, he held a 17-year-old pregnant female at gunpoint, forced her to go to a nearby park with him and raped and robbed her.  He pleaded guilty to rape in the first degree and was sentenced to 8-16 years' imprisonment.

*Mental Hygiene Law article 10 Proceeding*

On March 10, 2010, the State commenced a civil commitment proceeding against respondent pursuant to Mental Hygiene Law article 10 (see Mental Hygiene Law § 10.06 [a]).  The petition alleged that he was a "detained sex offender" who suffered from a "mental abnormality"; namely, ASPD and paraphilia NOS.

In September 2011, pursuant to Mental Hygiene Law § 10.07, Supreme Court held a jury trial to determine whether respondent suffered from a mental abnormality within the meaning of section 10.03 (i).  The State's sole witness, licensed psychologist Dr. Stuart Kirschner, had evaluated respondent at a correctional facility in April 2011 and also reviewed his

pertinent criminal history and psychological records in preparation for the evaluation and trial. Notably, while participating in a sex offender treatment program, respondent referred to himself as a "sadistic power rapist," which Dr. Kirschner found to be significant because it indicated that there was an overall "theme" whereby it was important to respondent that he be able to "exert power and control over others even though the other individual or the victim might resist." Respondent claimed that as a member of a gang, he could have sex with any of the female gang members, but that he committed the 1975 rapes because he wanted to have sex with a non-gang member. Dr. Kirschner found this to be significant because, although respondent could gratify his sexual needs through his gang membership, respondent's sexual desires drove him to victimize non-consenting women outside the gang.

Dr. Kirschner testified that respondent suffers from paraphilia NOS and ASPD, both of which are found in the DSM-IV-TR. The doctor explained that paraphilia involves sexual urges, fantasies or behaviors that involve either humiliation of, or the infliction of physical pain on, other individuals. The NOS portion of the paraphilia diagnosis is utilized where the individual does not meet the specific criteria of a particular paraphilia disorder, but it nonetheless is an accepted diagnosis that is utilized in the evaluation of sex offenders. In terms of paraphilia NOS (non-consent), the term, "non-consent" refers to

an unwilling participant who either does not, or is unable to give, consent.

In Dr. Kirschner's opinion, paraphilia NOS predisposed respondent to commit sex offenses because he has a "sense of entitlement that he [can] have what he wants at will, it's just a matter of overtaking the person" such that, if he has an urge, he feels entitled to act upon it without concern for the victim. Dr. Kirschner did not render this diagnosis merely because respondent had committed rapes. His opinion was based on respondent's concession that he has had numerous consensual sexual relationships with females, has frequented prostitutes on multiple occasions, and, despite such access to consenting partners, he has still committed rapes, which indicates that "[s]omething is definitely going on with [respondent] in regards to his sex urges and drives."

According to Dr. Kirschner, he diagnosed respondent with ASPD because respondent met all four criteria of that disorder: (1) he displayed evidence of conduct disorder prior to the age of 15 (through his gang membership and truancy); (2) he was at least 18 years old (and consistently engaged in conduct as an adult that constituted grounds for arrest); (3) his antisocial behavior did not occur during a course of schizophrenia or bipolar disorder (there is no evidence that respondent's behavior occurred as a result of either diagnosis); and (4) he has shown a pervasive disregard for and violation of the rights of others.

Dr. Kirschner testified that, with respect to the fourth criterion, respondent met all seven of the maladaptive traits. Dr. Kirschner explained that while approximately 85% of the prison population meets the ASPD criteria, that did not mean that all sex offenders necessarily suffer a mental abnormality as a result of that particular diagnosis. However, in his opinion, respondent is a "life-persistent offender" because his antisocial behavior extended well beyond adolescence and early adulthood.

When asked to provide a connection between respondent's ASPD diagnosis and his sexual behavior, Dr. Kirschner testified that respondent had given a number of examples concerning a "disturbance" in his ability to control his impulses and urges that predisposes him to the commission of sex offenses. For instance, respondent has a sense of entitlement "that if it's there, he can take it." With regard to the 1992 offense, respondent acknowledged that it was an "act of power and control" over a person who was rejecting his advances and that he was determined to "get what he wanted." Moreover, according to Dr. Kirschner, respondent has "sexualized" power and control such that, not only is he predisposed to committing offenses in general, he is particularly predisposed to committing offenses of a sexual nature because he derives gratification from overpowering people whom he thinks he can control.

Dr. Kirschner also testified that respondent has displayed an "impulsivity" over the course of his life that

speaks to the issue of "the volitional component and inability to control one's urges."  Specifically, he has been confined for most of his adult life, and during the limited times that he had been out of confinement, he ultimately reoffends.  That he was in "consensual sexual relationships" at the times he offended in 1975, 1977 and 1992 but still felt the need to look outside those relationships for sexual gratification further indicated that his desire for "power" and "control" merged with sexual needs that are not met in his primary relationships.

At the conclusion of the State's case, respondent moved to dismiss the petition on the ground that the State failed to meet its burden of establishing by clear and convincing evidence that he suffered from a mental abnormality.  Supreme Court denied the motion.

Respondent called licensed psychologist, Dr. Jeffrey Singer, who likewise diagnosed respondent with ASPD, but claimed that there was no basis to diagnose him with paraphilia.  With regard to the ASPD diagnosis, Dr. Singer testified that such a diagnosis does not mean that respondent has a mental abnormality, finding it significant that respondent had gone 17 years while incarcerated without committing a sexual offense and that he had successfully completed a sex offender treatment program in 2008-2009.

During summation, the State argued that the paraphilia NOS and ASPD diagnoses together predisposed respondent to commit

sexual offenses and resulted in his "serious difficulty in controlling his predisposition to sexually reoffend."

The jury concluded that respondent had a mental abnormality as defined by Mental Hygiene Law § 10.03 (i). The court thereafter held a dispositional hearing, pursuant to Mental Hygiene Law § 10.07 (f), and determined, among other things, that respondent was a dangerous sex offender requiring confinement and committed him to a secure treatment facility. As relevant here, respondent appealed the order of Supreme Court that determined, after the jury trial, that respondent suffered from a mental abnormality and that he was a dangerous sex offender requiring confinement.

The Appellate Division affirmed, holding that the State's expert testimony that respondent suffered from paraphilia NOS and ASPD was legally sufficient to support the jury's finding of mental abnormality (120 AD3d 694, 695 [2d Dept 2014]). It also determined that remarks made by the assistant attorney general during summation did not deprive respondent of a fair trial in light of the court's jury charge, and that Supreme Court did not err in denying respondent's application to preclude certain expert testimony at the dispositional hearing or in denying respondent's post-dispositional hearing motion to strike portions of that expert's testimony on the ground that the expert allegedly violated the Health Insurance Portability and Accountability Act of 1996 (HIPAA) (id. at 695-696). Finally,

the Appellate Division determined that Supreme Court properly found that there was clear and convincing evidence to support its determination that respondent was a dangerous sex offender requiring confinement (see id. at 696).

This Court granted respondent leave to appeal.

*Legal Sufficiency*

Respondent first contends that the State failed to establish by clear and convincing evidence that he has a "condition, disease or disorder that affects" his "emotional, cognitive, or volitional capacity . . . in a manner that predisposes him . . . to the commission of conduct constituting a sex offense."  Relying on Donald DD.'s holding that ASPD, by itself, is insufficient to support a finding of mental abnormality, respondent argues that the sufficiency analysis thus turns on whether paraphilia NOS is a sufficient predicate condition, and, according to respondent, it is not.  We disagree.

Unlike the sole diagnosis of ASPD in Donald DD., there were two diagnoses here:  ASPD and paraphilia NOS.  Thus, this case is distinguishable from Donald DD. in that, here, the diagnosis of ASPD is accompanied by a diagnosis of a "condition, disease or disorder" that we have already recognized as "potentially relevant to a finding of predisposition to conduct constituting a sex offense" (Donald DD., 24 NY3d at 191).

In that respect, this case is similar to Shannon S., which involved diagnoses of ASPD and paraphilia NOS.  There, we

held that paraphilia NOS is "a viable predicate mental disorder or defect that comports with minimal due process" (Shannon S., 20 NY3d at 107).  Moreover, in Donald DD., we acknowledged that Shannon S. did not address the specific question whether a paraphilia NOS diagnosis was generally accepted in the scientific community because counsel failed to request a Frye hearing, and we similarly declined to address that particular question in Donald DD. because no Frye hearing was requested or held (see Donald DD., 24 NY3d at 187).  Likewise, here, to the extent that respondent challenges the validity of paraphilia NOS as a predicate "condition, disease or disorder," we need not reach that argument because he did not mount a Frye challenge to the diagnosis.

Respondent's second challenge to the sufficiency of the mental abnormality determination focuses on the "serious difficulty in controlling" prong of the mental abnormality test. Relying on Donald DD., respondent argues that the State relied on the fact that he committed sex offenses to meet its burden in that respect.  The State correctly concedes that the mere fact that a rapist overpowers a nonconsenting victim is insufficient to support an article 10 petition or an underlying diagnosis of paraphilia NOS.  It is evident from this record, however, that the State did more than simply rely on respondent's commission of the offenses -- it presented "[a] detailed psychological portrait" that enabled Dr. Kirschner to determine the level of

control respondent had over his conduct (Donald DD., 24 NY3d at 188).

Dr. Kirschner found it significant that respondent referred to himself as a "sadistic power rapist" because it indicated that he enjoyed being able to "exert power and control over others" in the face of resistance.  Respondent has "sexualized power and control" to the point where a consensual relationship does not gratify him because "power, control, violence [have] all merged with his sexual need."

In short, Dr. Kirschner's testimony established that respondent has difficulty controlling his paraphilic urge to commit sex crimes by both overpowering and assaulting nonconsenting victims, and engages in this conduct notwithstanding the fact that numerous consensual sexual relationships are available to him.  The "psychological portrait" painted by the State is that respondent becomes sexually aroused by overpowering nonconsenting women and has serious difficulty in controlling such conduct.  We conclude that, on this record, the evidence presented was legally sufficient to establish by clear and convincing evidence that respondent has "serious difficulty in controlling" his sexual misconduct.

*Remaining Issues*

Respondent's contention that certain summation remarks made by the assistant attorney general deprived him of a fair trial is unpreserved for our review (see generally People v

Tonge, 93 NY2d 838, 839-840 [1999]).  His related contention that
Supreme Court should have issued a curative instruction to
address the assistant attorney general's comment during summation
that "indicated to the jury that given the option of not
accepting any testimony ultimately from either [the State's or
respondent's] expert, [it] could still decide this case because
they could connect the dots" is before us.  Indeed, respondent's
counsel asked the court to charge the jury that although it could

> "reject to whatever extent either of the
> experts' testimony, that [its] verdict must
> be based on the evidence in this case, and
> that evidence consists entirely of testimony.
> To clarify, that they, in fact, have to rely
> on clear and convincing evidence supplied by
> the attorney general and cannot discount that
> and still find a verdict in their favor."

The court declined to give that particular instruction,
but stated that it would apprise the jury of the appropriate
standard and that it must decide the case based on the record
evidence.  It thereafter charged the jury that the State had the
burden of demonstrating by clear and convincing evidence that
respondent suffered from a mental abnormality, and that, in
making such a determination, the jury was to rely on only the
testimony and the exhibits and that it was up to the jury to
determine what weight to give the expert testimony.  Finally, the
court instructed the jury that it was required to apply the law
as instructed by the court.  Thus, on this record, the Appellate
Division properly held that Supreme Court providently exercised
its discretion in declining to give the particular charge

requested by respondent and issuing its own charge.

Prior to the dispositional hearing, respondent moved to preclude the testimony of Dr. Kirschner and Dr. Kunkle (a member of the Office of Mental Health's case review team), claiming that neither expert had stated in their respective reports whether respondent was a dangerous sex offender requiring confinement or a sex offender requiring strict and intensive supervision and treatment (SIST).  We hold that the court properly denied the motion as to both experts.

With regard to Dr. Kirschner's report, which respondent received prior to trial, the record indicates that the report specifically delineated Dr. Kirschner's conclusion that respondent required inpatient treatment in a secure psychiatric center.  Although it appears that Dr. Kunkle's report did not contain Dr. Kunkle's opinion with regard to the dispositional phase, the court took note of that fact and counsel was able to cross-examine Dr. Kunkle concerning his recommendation.  Thus, under the circumstance of this particular case, the court did not abuse its discretion in denying respondent's preclusion motion.

Respondent also made an unsuccessful post-hearing motion to strike certain parts of Dr. Kunkle's testimony on the ground that Dr. Kunkle allegedly violated HIPAA by conducting a post-petition search of Department of Corrections records to determine whether respondent had received any sex offender treatment after the filing of the petition.  Respondent does not

identify what particular records Dr. Kunkle reviewed, nor does it appear from the record that the search uncovered any such records.  Accordingly, the Appellate Division properly concluded that Supreme Court did not err in denying respondent's motion to strike that testimony (see 45 CFR 160.103).

We have considered respondent's legal sufficiency challenge to Supreme Court's determination that he is a dangerous sex offender requiring civil confinement and conclude that it is without merit.

IV.

*Anthony N.*

Respondent Anthony N.'s criminal history consists of a number of assaults and sex offenses.  In 1983, when he was 27 years old, he went to an ex-girlfriend's home and demanded that she drop assault charges that she had filed against him.  He also demanded that she "go to bed with him."  When she refused to do either, he grabbed her by the hair and struck her in the eye, resulting in the victim's four-day hospitalization.  Respondent pleaded guilty to assault in the third degree and was sentenced to six months in jail.  One year later, in 1984, respondent went to the apartment of an unknown female and claimed to be looking for another person.  When the woman opened the door, respondent forced himself inside, pushed the woman into the bathroom and fondled her breasts.  Although he was charged with, among other things, assault and sexual abuse, he pleaded guilty to one count

of burglary in the third degree and was sentenced to 6 months in jail with 5 years' parole.

In November 1987, respondent was arrested for committing the offenses of sexual abuse in the first degree and assault in the third degree against his paramour.  Those charges were eventually dropped.  However, the following year, respondent entered the same woman's apartment in violation of an order of protection, locked the door, told her that he had to "have [her] one more time" and raped her.  He was thereafter arrested for rape in the first degree and burglary in the second degree.  He pleaded guilty to one count of sexual misconduct and served 17 months in prison.

In 1993, respondent, then 37 years old, met a woman at a bar through a mutual friend.  He took her to a nearby music studio, where he raped and sodomized her.  Although charged with rape in the first degree, he eventually pleaded guilty to sexual abuse in the first degree and served four years in prison.

As to the instant offense, respondent began a tumultuous relationship with the victim in 1999 that eventually ended by 2003.  However, later that year in June 2003, upset that she was seeing another man, respondent broke into her house when she was not there.  When she arrived home, he ambushed her by swinging a hammer at her, causing her to fall down the stairs. He threatened to rape and kill her and then kill himself. Respondent was arrested for, among other crimes, attempted rape,

burglary and assault.  He pleaded guilty to attempted burglary in the second degree (a "designated felony" that can constitute a "sexually motivated" offense under Mental Hygiene Law § 10.03 [f], [p] and [s]), and was sentenced to 7 years' imprisonment with 5 years' postrelease supervision.

*Mental Hygiene Law article 10 Proceeding*

On June 9, 2010, before respondent was due to be released from prison, the State commenced an article 10 civil commitment proceeding against him, asserting that he had, as relevant here, borderline personality disorder[3] and ASPD, and that such disorders constituted "mental abnormalities" under section 10.03 (i).  After a hearing, Supreme Court held that there was probable cause to believe that respondent was a detained sex offender requiring civil management.

The State called psychologist Dr. Joel Lord, who

---

[3] According to the DSM-V, borderline personality disorder is "[a] pervasive pattern of instability of interpersonal relationships, self-image, and affects, and marked impulsivity, beginning by early adulthood and present in a variety of contexts, as indicated by five or more of the following:" impulsivity in at least two areas that are potentially self damaging, like substance abuse and sex; recurrent suicidal behavior or threats, or self-mutilating behavior; "[a]ffective instability due to a marked reactivity of mood"; "[c]hronic feelings of emptiness"; difficulty in controlling anger and inappropriate, intense anger; "[t]ransient, stress-related paranoid ideation or severe dissociative symptoms"; "[f]rantic efforts to avoid real or imagined abandonment"; "[a] pattern of unstable and intense interpersonal relationships characterized by alternating between extreme of idealization and devaluation"; and "[i]dentity disturbance: markedly and persistently unstable self-image or sense of self" (DSM-V 663 [5th ed. 2013]).

testified that he had attempted to interview respondent but that his efforts were rebuffed.  Dr. Lord reviewed presentence investigation reports, grand jury minutes and parole documents and notes in preparation for his evaluation of respondent.  A week before the trial, Dr. Lord had spoken with four of respondent's victims -- three of whom had relationships with respondent -- about respondent's behavior.[4]  Two of the women -- the victims from the 1983 and 2003 incidents -- recounted various instances of domestic violence that respondent committed against them.  Three of the women claimed that respondent had sex with them without their consent.

Dr. Lord testified with a reasonable degree of professional certainty that, based on his review of the records and conversations with the victims, respondent suffers from borderline personality disorder and ASPD.[5]  The borderline personality disorder diagnosis was premised on the fact that respondent had attempted suicide on two occasions and that there was evidence of emotional instability and impulsivity related to sex and drugs.  Moreover, respondent's conduct of "exploding" and "beating up" the victims that he lived with supported that

---

[4]  Dr. Lord explained that it was standard practice in his profession to rely on victim interviews when conducting an evaluation of an article 10 respondent, particularly in a case such as this, where the respondent refuses to be interviewed and has not participated in a sex offender treatment program.

[5]  He also diagnosed respondent with alcohol abuse and polysubstance disorder.

diagnosis.  The ASPD diagnosis was premised on respondent's history of taking advantage of others, difficulty with the law, impulsivity and remorselessness, along with the presence of a conduct disorder before the age of 15.

In explaining why he believed respondent has a mental abnormality, Dr. Lord testified that, with regard to three victims with whom respondent had relationships, respondent feels "entitled" to sex.  The same could be said with regard to the 1993 victim, as evidenced by his statement to that victim "I'm going to have you," which was the same language he used with another one of his victims.  This entitlement on respondent's part demonstrates that he does not appreciate the rights of other people and that he has a poor ability to control his behavior. In Dr. Lord's opinion, the "primary predisposing factors" to respondent's mental abnormality are his personality disorders, resulting in his disregard of the rights of others, inability to appreciate others' suffering, along with his own sense of entitlement, instability, irritability and anger.  All of those traits "come together and contribute to this abuser style that he developed, this strategy for always having somebody that he could force into submission and thereby elevate himself . . . ." Ultimately, Dr. Lord testified with a reasonable degree of professional certainty that, based on his review of the relevant records, respondent's attempted burglary conviction constituted a "sexually motivated offense."

The State also called licensed clinical psychologist John Thomassen, who reviewed respondent's mental health records and conducted an interview of respondent.  He diagnosed respondent with borderline personality disorder based on his criminal history, which consisted of 46 arrests and/or convictions (with all but 16 convictions being dismissed), all of which save for three of them involved the same victims with whom he had long-term relationships.[6]  The first two long-term relationships each had at least a dozen situations where respondent either violated orders of protection or violated probation or parole, and continued pursuing the women after they had pressed charges against him.  The criminal history indicated that respondent is a person who cannot let go in a relationship and is desperate to restore it.  When respondent feels abandoned, or when the relationship is threatened, he either injures himself or attempts suicide, and when faced with the loss of a relationship, he experiences irritability, extreme anger and depression.

Dr. Thomassen testified that respondent's borderline personality disorder predisposes him to conduct that constitutes the commission of a sex offense in that respondent's "desperate need to have some relationship or contact with women to which he is connected or wishes to have a connection" results in him

---

[6]  Dr. Thomassen did not diagnose respondent with ASPD, polysubstance dependence or alcohol abuse.

engaging in forced sex against his paramours. Those with borderline personality disorder may attempt to make a connection with another person "by needing to have sex with them against their will," which suggested to him that respondent has a predisposition to act on an urge and difficulty controlling that urge.

At the conclusion of the State's case, respondent moved to dismiss the petition on the grounds that the State failed to demonstrate that the attempted burglary conviction constituted a sexually motivated offense and that the State did not establish that respondent had a mental abnormality. The court denied both motions.

Respondent called his own expert, licensed psychologist Dr. Erik Schlosser, who testified that respondent does not have either ASPD or borderline personality disorder. He acknowledged that respondent has traits of borderline personality disorder, but testified that the evidence only indicated that he is a "domestic batterer."

The jury determined that the attempted burglary conviction constituted a sexually motivated offense and that respondent was a detained sex offender who suffered from a mental abnormality. In April 2012, Supreme Court held a dispositional hearing, and, after hearing from Drs. Lord and Schlosser, it determined that respondent should be released to SIST. In October 2012, the State petitioned to revoke respondent's SIST

and sought to confine him in a secure treatment facility based upon his alleged violations of the SIST conditions. Dr. Lord testified at the SIST revocation hearing. Respondent did not call any witnesses. Supreme Court concluded that respondent was a dangerous sex offender now requiring confinement.

Respondent appealed from two orders, the first order finding that he was a dangerous sex offender requiring civil management and the second order revoking his SIST (120 AD3d 941 [4th Dept 2014]). With regard to the appeal from the first order, the Appellate Division held that the evidence was legally sufficient to establish that the attempted burglary conviction constituted a sexually motivated offense, and that there was legally sufficient evidence establishing that the personality disorders with which he was diagnosed predisposed him to commit sex offenses and resulted in him having serious difficulty in controlling his behavior (see id. at 942-943). The court also held that respondent did not preserve his contention that his due process rights were violated by the introduction of hearsay evidence that formed the basis of the experts' opinions. Finally, with regard to the appeal from the second order, the Appellate Division held that the State established by clear and convincing evidence that respondent was a dangerous sex offender requiring confinement, and rejected his argument that Supreme Court was required to specifically address the issue of a less restrictive alternative (see id. at 943).

This Court granted respondent leave to appeal, and we now affirm.

*Hearsay*

Respondent argues that Dr. Lord's hearsay basis testimony should have been excluded pursuant to our holding in Matter of State of New York v Floyd Y. (22 NY3d 95 [2013]), which requires hearsay "evidence to meet minimum requirements of reliability and relevance before it can be admitted at an article 10 proceeding" (id. at 109).  Because respondent never raised that particular objection, however, the court was never alerted to the hearsay argument that he now makes on this appeal.[7]  Thus, the issue is unpreserved for our review.

*Legal Sufficiency*

Respondent makes two legal sufficiency arguments on appeal.  First, he claims that the State failed to meet its burden of proving that his 2003 conviction for attempted burglary in the second degree was a "sexually motivated" offense.

An individual may not be subject to civil management unless he or she is found to be "a detained sex offender who suffers from a mental abnormality" (Mental Hygiene Law § 10.07 [d]).  A "detained sex offender" is "a person who is in the care, custody, control, or supervision of an agency with jurisdiction,

---

[7] Respondent asserts that his due process rights were violated by the introduction of hearsay statements of four of his victims through the expert testimony of Dr. Lord, who had spoken to the victims a week before the commencement of the article 10 trial.

with respect to a sex offense or designated felony, in that the person is . . . [a] person who stands convicted of a designated felony that was sexually motivated and committed prior to the effective date of [article 10]" (id. at § 10.01 [g] [4]). The term "sexually motivated" is defined as meaning "that the act or acts constituting a designated felony were committed in whole or in substantial part for the purpose of direct sexual gratification of the actor" (id. at § 10.01 [s]).

Here, it is undisputed that respondent's felony of attempted burglary in the second degree is a "designated felony" under the statute (id. at 10.03 [f]), and such a felony also falls under the definition of a "sex offense" (id. at § 10.03 [p]). The only dispute is whether the proof at trial established that the offense was "sexually motivated." At trial, the court charged the jury that it had to find that the attempted burglary crime was sexually motivated beyond a reasonable doubt in light of a federal court order that required application of that standard (see Mental Hygiene Legal Service v Cuomo, 785 F Supp 2d 205, 208-209 [SD NY 2011]). That order was later vacated on appeal (Mental Hygiene Legal Services v Schneiderman, 472 Fed Appx 45 [2d Cir 2012]).

In light of the court's charge, we need not delineate what burden of proof should be applied with regard to the issue of sexual motivation because the evidence in the record is sufficient to meet the more stringent "beyond a reasonable doubt"

standard.  Specifically, the victim's grand jury testimony, which was deemed reliable by the State's and respondent's experts, adequately detailed the circumstances surrounding the 2003 attempted burglary offense, including the fact that respondent arrived at the victim's residence with, among other things, a "sex toy" and lubricant, and told the victim that he was going to rape her.  He dragged her to her bedroom, made her take off her clothes and directed her to lie face down on the bed.  Respondent stopped only because the victim's son had come home, and the victim was not able to escape until she promised him that he could move back in with her and that they would have sex all night.  In light of these facts, the jury had a valid line of reasoning upon which it could infer that respondent's attempted burglary conviction was motivated "in whole or in substantial part for the purpose of [his] direct sexual gratification."

In reliance on Donald DD., respondent next argues that, even if his 2003 conviction for attempted burglary in the second degree constitutes a "sexually motivated" offense, a diagnosis of borderline personality disorder alone cannot form the basis for a mental abnormality.  Specifically, he contends that the State's experts failed to link the borderline personality disorder diagnosis to any disorder involving a predisposition to commit sex offenses, in particular, a sexual disorder like paraphilia, paraphilia NOS or pedophilia.  Thus, according to respondent, the State's proof was legally insufficient to establish by clear and

convincing evidence that he suffers from a mental abnormality that predisposes him to the commission of conduct constituting a sex offense.  We disagree.

Section 10.03 (i)'s language "congenital or acquired condition, disease or disorder" is not limited to solely sexual disorders, as respondent claims.  Rather, one may possess a "condition, disease or disorder" that does not constitute a "sexual disorder" but nonetheless "affects the emotional, cognitive, or volitional capacity of a person that predisposes him or her to the commission of conduct constituting a sex offense."  To be sure, we stated in Donald DD. that ASPD by itself "proves no sexual abnormality," but that was in the context of our observation that an ASPD diagnosis means nothing more than a person has a tendency to commit crimes (Donald DD., 24 NY3d at 190).[8]  As such, Donald DD. did not engraft upon the "condition, disease or disorder" prong a requirement that the "condition, disease or disorder" must constitute a "sexual disorder."[9]

---

[8]  The dissent correctly notes that "there is no basis to overrule Donald DD." (dissenting op, at 5), and we do not do so here.  Any contention that we are is misguided and is derived from a misinterpretation of our rationale in Donald DD.

[9]  Indeed, we noted in Donald DD. that our prior decision in Shannon S. was distinguishable because the diagnosis at issue there was "potentially relevant to a finding of predisposition to conduct constituting a sex offense" (Donald DD., 24 NY3d at 191) -- that language could hardly be read as mandating a finding that respondent has a sexual disorder.

We also reject respondent's contention that our rationale in Donald DD. that ASPD, along with evidence of sexual crimes, cannot by itself be used to support a finding of mental abnormality, should likewise apply to a diagnosis of borderline personality disorder.  Our problem with the ASPD diagnosis in Donald DD. was that such a diagnosis amounted to "'little more than a deep-seated tendency to commit crimes'" (Donald DD., 24 NY3d at 190 [citation omitted]), and that such a general tendency does not amount to a predisposition "to the commission of conduct constituting a sex offense" (id.).  Our concern in Donald DD. was that the utilization of ASPD as a predicate for a finding of mental abnormality was insufficient to distinguish a sex offender who has a mental abnormality that subjects him to civil commitment from a typical recidivist.

There is no such concern with respect to a diagnosis of borderline personality disorder, which brings us to the second prong of the mental abnormality test, namely, whether the State presented legally sufficient evidence to link respondent's diagnosis of borderline personality disorder to a predisposition to commit sex offenses.  We hold that it did.

The State's proof established that respondent's borderline personality disorder predisposes him to conduct constituting the commission of sex offenses because he has a need "to have sexual contact, not just a relationship with [a] person, not just having them back."  One of the traits of borderline

personality disorder is a fear of abandonment and the need to restore a relationship that has been threatened.  The State demonstrated that respondent has a "need, [and has] to have a connection with these women, expressing it by needing to have sex with them against their will, despite all of these prohibitions against it."  Further, there was evidence that the need itself was more than just a need to be in a relationship, however; respondent "has to have a sexual relationship which makes him whole and calms him in some way" such that "he can't take no for an answer and he has difficulty with any prohibitions against this."  Thus, there was proof of a "strong sexual component" to respondent's diagnosis, and respondent has conceded that he has serious difficulty controlling his sexual urges.  Rather than establishing a general tendency to commit crimes, the State's proof linked respondent's borderline personalty disorder diagnosis to his predisposition to commit sex offenses.  As such, under the circumstances of this particular case, the State established by clear and convincing evidence the predispostion prong of the mental abnormality test.

Finally, we have considered respondent's argument that the State failed to prove by clear and convincing evidence at the SIST revocation hearing that he was a "dangerous sex offender requiring confinement" and conclude that it is without merit.

V.

*Richard TT.*

Respondent Richard TT. has a long history of committing sex offenses. In 1999, when he was 12 years old, respondent anally sodomized a 5-year-old girl and attempted to anally sodomize an 8-year-old boy.  He pleaded guilty to sexual abuse in the first degree and endangering the welfare of a child, was adjudicated a juvenile delinquent and was placed on probation for one year.  His probation was revoked because of numerous non-sexual incidents that occurred at school.  As a result, respondent was placed in a juvenile detention facility.  While there, he confessed to sexually victimizing six girls, including his sister and two of her friends, his stepsister and two of his cousins.  He stated that his sister wanted to have sex with him.

In January 2007, a few months after being released from serving a 9-month jail sentence for criminal contempt in the second degree for violating an order of protection, respondent -- then 19 years old -- went to a "teen night" at the local YMCA and signed in under an alias.  He tricked a 15-year-old girl into going outside with him and, despite her protests, raped her behind the YMCA building.  He threatened to kill her if she reported the rape.  In June 2007, respondent had intercourse with a 14-year-old girl, knowing that the girl was underage.  As relevant here, respondent pleaded guilty to rape in the third degree and sexual misconduct in satisfaction of the charges

lodged against him for both incidents.  He was sentenced to an aggregate term of 1-3 years' imprisonment.

*Mental Hygiene Law article 10 Proceeding*

In May 2010, two weeks before respondent's release from custody, the State commenced an article 10 civil management proceeding against respondent alleging that he suffered from a mental abnormality.  Respondent waived his right to a hearing on the issue of probable cause and his right to have a jury consider the issue of mental abnormality.  He was ordered confined to an Office of Mental Health (OMH) facility while awaiting the article 10 trial.

At the trial, the State called licensed psychologist Trica Peterson, who had been employed by OMH from 2008 through 2011 and had conducted an evaluation of respondent during her time there.  During that evaluation, respondent admitted that he had been hospitalized at the age of 13 for threatening suicide, and had begun "cutting" himself at age 11.

Based on her review of the records, Dr. Peterson stated that respondent had amassed 10 victims by the age of 19, which, in her opinion, confirmed that he had "issues" with sexual behavior.  Specifically, during his time at the juvenile detention facility, he admitted to sexually abusing six additional children (mostly family members), engaged in cutting, was described as being "impulsive" and "aggressive" and was known for making "sexually inappropriate commentary."  He was

eventually discharged from the detention center, and remained at large until he was sentenced to state prison for the rape offenses.  Although respondent participated in sex offender treatment programs while incarcerated, he did not complete them due to his failing a urine test and being found with pornography.

Dr. Peterson testified with a reasonable degree of professional certainty that respondent suffered from ASPD, borderline personality disorder and psychopathy.[10]  She acknowledged that ASPD and borderline personality disorder diagnoses do not, by themselves, indicate that a person is predisposed to committing sexual offenses.

With regard to the ASPD diagnosis, Dr. Peterson stated that respondent met all four criteria, i.e., respondent was at least 18 years old, he had symptoms of conduct disorder prior to the age of 15, he had three or more traits demonstrating "[a] pervasive pattern of disregard for and violations of the rights of others," and his antisocial behavior did not occur during a course of schizophrenia or bipolar disorder.

Dr. Peterson also testified that respondent met five out of the nine criteria necessary to support a diagnosis of borderline personality disorder.  Specifically, he had persistent issues with impulsivity dating back to when he was a child, had engaged in repeated "suicidal gestures," displayed "reactive moods" and difficulty in controlling his anger, and was sensitive

---

[10]  Her other diagnoses included cannabis and alcohol abuse.

to being abandoned by a significant other to the point of engaging in "extreme behavior" to prevent the dissolution of the relationship.

Dr. Peterson acknowledged that the psychopathy diagnosis was not one that could be found in the DSM. Psychopathy is an "extreme form of [ASPD]" and individuals who suffer from it engage in antisocial behavior, leading to multiple arrests and repeated revocations of community release. Moreover, individuals who suffer from psychopathy are aggressive, emotionally unstable, impulsive and lack empathy and remorse. Specifically, those with psychopathy have poor behavioral control, and issues with impulsivity, and they are prone to taking risks. In September 2011, respondent was scored utilizing the "Psychopathy Checklist, Revised" test, which involved a consideration of 20 factors that are used to determine whether psychopathy is "strongly present" in a person. A score of 30 or more indicated that psychopathy is "strongly present" in the individual; respondent's score from the test administered by Dr. Peterson was over 30.

Dr. Peterson testified, as relevant here, that the ASPD, borderline personality disorder and psychopathy conditions, in combination, established that respondent has a "congenital or acquired disease, condition or disorder." She opined that those conditions or disorders affect respondent's cognitive or volitional capacity and "predispose" him to commit sex offenses.

Specifically, these personality disorders affect a person's "impulse control" and "emotions" and their "interpersonal relationships." Respondent's behavior over time demonstrated an "emotional reactive impulsivity" and "aggressiveness" that had been present since he was a child. His attitude and history of sexual preoccupation demonstrate that he feels "entitled" to sex regardless of its impact on his victims.

Dr. Peterson also testified that respondent has displayed a "lack of responsibility for his own actions" -- as evidenced by his placing blame on the victims themselves or victims' parents. He told Dr. Peterson during their interview, for example, that his 5-year-old and 8-year-old victims had prompted or encouraged the sexual contact.

Finally, Dr. Peterson explained that respondent also has "serious difficulty" in controlling his sexual behavior, pointing out that he had victimized ten individuals by the age of 19. In his sex offender treatment program writings, respondent specifically admitted that he targeted teenage girls because "they were vulnerable and easily gullible" and that he enjoyed masturbating to young girls. He conceded that he attended "teen night" at the YMCA with the intention of meeting girls to have sex with them. Notably, while awaiting his article 10 trial, respondent stated that he was concerned about the frequency of his sexual thoughts, and made the observation that such thoughts were "driving him nuts." Dr. Peterson stated that respondent

lacks the "volitional capacity" to stop what he is doing, as evidenced by his difficulty in maintaining his sexual behavior within the confines of the law despite repeated (but failed) efforts at undergoing sex offender treatment. She concluded that he has an "ongoing attitude" that indicates that he is likely to reoffend, based on his placing blame on the victims, minimizing his own role in their sexual attacks and making statements in group therapy that it is not coercive to pressure women into having sex with him even when they have rebuffed his efforts.

At the conclusion of the State's case, the court reserved respondent's right to make a motion with regard to legal sufficiency until the following day. Respondent thereafter called his own expert, licensed psychologist Erik Schlosser, who also testified that respondent suffered from disorders -- ASPD and borderline personality disorder -- and that those disorders could, in fact, affect his emotional, cognitive or volitional capacity. However, in Dr. Schlosser's view, those disorders did not predispose him to the commission of conduct constituting a sex offense, nor did they result in respondent having serious difficulty in controlling such conduct.

Supreme Court found by clear and convincing evidence that respondent suffered from a mental abnormality -- ASPD and borderline personality disorder, with the presence of psychopathic traits. After conducting a dispositional hearing, Supreme Court held that respondent was a "dangerous sex offender

requiring civil confinement" and ordered his commitment to a
secure treatment facility.

During the pendency of respondent's appeals of the
Supreme Court's orders finding that respondent suffered from a
mental abnormality and that he was a dangerous sex offender
requiring confinement, this Court issued its opinion in Donald
DD. Respondent thereafter moved pursuant to CPLR 4404 (b) and
CPLR 5015 (a) to vacate and dismiss the orders on the ground of
legal sufficiency. The State opposed the motion. However,
Supreme Court, citing to its discretionary authority to vacate
its own judgment (as provided by CPLR 5015), held that it was
required to "heed the pronouncements in Donald DD." and grant
respondent's motion, notwithstanding the fact that it believed
respondent suffered from a mental abnormality as defined by
Mental Hygiene Law § 10.03 (i). The State appealed that order.[11]

A divided Appellate Division held that Supreme Court
abused its discretion in vacating its order of civil commitment,
holding that the Donald DD. decision "did not warrant vacatur of
orders that Supreme Court otherwise viewed to be supported by the
evidence . . ." (132 AD3d 72, 75 [3d Dept 2015]). The majority
noted that respondent "was diagnosed with several mental
disorders" and that the record was "replete with proof that the

_____

[11] Consequently, the Appellate Division dismissed
respondent's appeals from the Supreme Court's commitment orders
as moot, holding that "[n]o appeal lies from a vacated judgment
or order" (127 AD3d 1528, 1528 [3d Dept 2015]).

disorders . . . cause[d] respondent to exhibit impulsive and inappropriate sexual behavior" (id. at 76-77).  Moreover, Dr. Peterson identified a number of instances where respondent demonstrated a lack of remorse and inability to understand the inappropriateness of his conduct" (id. at 77-78).  Thus, according to the majority, because the evidence otherwise supported the finding that respondent was a dangerous sex offender requiring civil confinement such that there was no need for Supreme Court to grant the motion to vacate in the interest of justice, it abused its discretion in doing so (see id. at 78).

The two dissenting Justices stated that they were constrained by our holding in Donald DD. to conclude that respondent's civil confinement was not justified.

The Appellate Division granted respondent's motion for permission to appeal to this Court, and, pursuant to CPLR 5713, certified to us the question whether it erred as a matter of law in reversing on the law the order of Supreme Court that granted respondent's motion to vacate its two prior orders.

*Legal Sufficiency*

The procedural posture of this proceeding is different from those in Dennis K. and Anthony N.  Here, notwithstanding its stated belief that the record supported its prior mental abnormality determination, Supreme Court vacated its prior orders on the ground that our holding in Donald DD. mandated such relief.  To that end, a question of law is presented whether

Supreme Court properly interpreted Donald DD., and the Appellate Division, having concluded that the evidence was legally sufficient to support the finding of mental abnormality, determined that Supreme Court abused its discretion in granting respondent's motion to vacate.  We therefore begin our analysis of the legal sufficiency of the evidence presented by the State at the article 10 proceeding.

Respondent makes an argument that is identical to one of the arguments made by Anthony N., namely, that because borderline personality disorder is not a "sexual disorder," it may not serve as a predicate "condition, disease or disorder." For the reasons set forth in our legal sufficiency analysis in Anthony N., however, respondent's reliance on Donald DD. in support of this contention is misplaced.

Pointing to Dr. Peterson's testimony that there is a "considerable overlap in symptoms between borderline personality disorder and ASPD," respondent argues that, in light of our holding in Donald DD., the combination of the two disorders is insufficient for purposes of finding a mental abnormality.  We decline respondent's invitation to consider the ASPD and borderline personality disorder diagnoses in isolation: Donald DD. expressly held that an ASPD diagnosis cannot support a finding of mental abnormality if it is not accompanied by any other diagnosis, but, in this instance, the State presented evidence that respondent was diagnosed with more than one

"condition, disease or disorder."

Here, Dr. Peterson diagnosed respondent with three disorders -- ASPD, borderline personality disorder and psychopathy -- all of which she claims create a "personality structure" that disregards the wants and needs of other people. Such disorders affect respondent's impulse control, emotions, cognitions and interpersonal relationships, and they manifest themselves in his commission of sex offenses. The combination of these disorders affect him in that he has a history of sexual preoccupation and objectification and placing blame on teenage girls, and he believes that he is entitled to sex regardless of its impact on the victims. This combination also results in emotional reactivity, impulsiveness and aggressiveness.

With regard to the offenses that he committed in 1999, respondent told Dr. Peterson that it appeared to him that the 5-year-old victim "knew about this stuff . . . she wanted me to touch her in the front," and he blamed the 8-year-old victim for bringing up the topic of anal sex. Respondent also has poor volitional controls. In his sex offender treatment program homework, he conceded that he surrounded himself with "younger" and "weaker" people so he could easily influence them, particularly young girls because of their gullibility. He attended "teen night" because it was easy to meet girls, and he claimed that he "manipulated" and pressured that victim into having sex and "did not stop until she said yes." He also

conceded in his writings that he enjoyed masturbating to young girls.

Finally, the State provided "[a] detailed psychological portrait" of respondent that met the State's burden of demonstrating by clear and convincing evidence that he had "serious difficulty" in controlling his sex-offending conduct. In March 2012, respondent stated that his frequent sexual thoughts were making him "nuts." Dr. Peterson found it significant that by the age of 19, respondent had 10 victims and that he had yet to successfully complete a sex offender treatment program (having been kicked out of three of them, one time because he was in possession of pornography). Moreover, she stated that respondent's sex offender treatment program homework made repeated references to sexual contact, stating that he targets teenage girls because they are gullible and vulnerable and that he "love[s] masturbating to young girls." Although respondent has access to adult partners, respondent continues to remain interested in underage girls. Dr. Peterson also explained that respondent's sexual preoccupation dates back to his public school records and continued through his residential treatment when he was a juvenile all the way to his stays at secure treatment facilities.

Respondent also exhibits cognitive distortions that demonstrate he has serious difficulty controlling his sex-offending behavior, particularly concerning his understanding

about what constitutes consensual sex.  In February 2012, while participating in a treatment group at a secure facility, he stated that if he desired sex with a woman, he would "talk her into" having sex with him.  When it was pointed out to him that it was not appropriate to pressure women into having sex and that if a woman eventually agrees to engage in sex just to get him to stop asking her, it was still considered nonconsensual, respondent downplayed that comment, stating that it was "ridiculous" that he could not persuade "an age appropriate mate into [having] sex."

In short, Dr. Peterson did not simply rely on one diagnosis in establishing sexual abnormality.  She considered a number of particular disorders, and testified how those disorders, in combination, presdisposed respondent to the commission of conduct constituting sex offenses, resulting in his having "serious difficulty in controlling such conduct."  That detailed testimony was sufficient to establish by clear and convincing evidence that respondent had a mental abnormality.

Supreme Court, in vacating its orders, nonetheless expressed its belief that the State had met its burden and simply vacated the orders based in its misinterpretation of our holding in Donald DD.  The Appellate Division, recognizing that misinterpretation, properly held that Supreme Court abused its discretion in vacating the orders.  Therefore, we affirm the order of the Appellate Division and answer the certified question

in the negative.

In <u>Matter of State of New York v Dennis K.</u>, the order of the Appellate Division should be affirmed, without costs.

In <u>Matter of State of New York v Anthony N.</u>, the orders of the Appellate Division should be affirmed, without costs.

In <u>Matter of State of New York v Richard TT.</u>, the order of the Appellate Division should be affirmed, without costs, and the certified question answered in the negative.

Matter of the State of New York v Dennis K.
Matter of the State of New York v Anthony N.
Matter of the State of New York v Richard TT.

Nos. 106, 107 & 108

RIVERA, J.(concurring in Matter of the State of New York
v Dennis K. and dissenting in Matter of the State of New York
v Anthony N. and Matter of the State of New York v Richard TT.):

I concur in Matter of the State of New York v Dennis K. based on our existing case law and the record developed at respondent's article 10 trial. However, I dissent in Matter of the State of New York v Anthony N. and Matter of State of New York v Richard TT. because in my opinion a diagnosis of borderline personality disorder (BPD) may not establish, as a legal matter, the basis for civil management, and the records in these cases are otherwise devoid of facts sufficient to support civil confinement.

I.

A "mental abnormality" is defined as

"a congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct"

(Mental Hygiene Law § 10.03 [i]). Sex offenders with "mental

- 1 -

abnormalities that predispose them to engage in repeated sex offenses . . . may require long-term specialized treatment modalities to address their risk to reoffend" (Mental Hygiene Law § 10.01 [b]), including strict and intensive outpatient supervision (Mental Hygiene Law § 10.01 [c]) and, "in extreme cases, confinement [for] the most dangerous offenders . . . in order to provide them such treatment and to protect the public from their recidivistic conduct" (id. § 10.01 [b]).

As a matter of substantive due process, the statute must set up a mechanism for "distinguish[ing] the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects [the offender] to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case" (Kansas v Crane 534 US 407, 413 [2002], citing Kansas v Hendricks, 521 US 346, 357-358 [1997]).  "A state may only use civil process to confine a sex offender for treatment of 'mental abnormality . . . that makes it difficult, if not impossible, for the person to control his [or her] dangerous behavior'" (State v Floyd Y., 22 NY3d 95, 103 [2013], quoting Hendricks, 521 US at 358 [internal quotation marks omitted]).

The loss of liberty and risk of long-term, if not permanent, confinement at stake in article 10 proceedings counsels that the statute be narrowly interpreted to ensure that those subject to civil management are the aberrational recidivist sex offenders.  In furtherance of the twin goals of article 10 --

public safety and treatment -- civil management is meant to protect the public from a particular class of dangerous sex offenders and to provide for those offenders' therapeutic treatment. The statutory distinction between a sex offender with a mental abnormality that prevents sexual impulse control, and a recidivist, is the animating feature of the statute. Without it, article 10 could not survive constitutional scrutiny.

II.

Dennis K.

The Court has previously sanctioned a diagnosis of paraphilia NOS as a predicate mental disorder or defect to a finding of a mental abnormality within the meaning of Mental Hygiene Law § 10.03 (i) (Matter of State of New York v Shannon S., 20 NY3d 99, 107 [2012]). Similarly, in Dennis K., respondent's diagnosis of paraphilia NOS and antisocial personality disorder (ASPD) could serve as a basis for the jury's mental abnormality finding. Respondent's challenge to the scientific basis for this diagnosis is appropriately left to a hearing in accordance with Frye v United States (293 F 1013 [DC Cir 1923]), which he did not request.

As discussed by the majority, on the facts presented, there was sufficient evidence that respondent suffers from a mental abnormality (Mental Hygiene Law § 10.03 [i]). Notably, respondent identifies himself as a "sadistic power rapist," who

is aroused by exercising power over his non-consenting partners.
Respondent's statements, along with the other evidence of his
inability to control his urges leading to his paraphilia NOS and
ASPD diagnoses, distinguishes him from other rapists and places
him within the class of sex offenders subject to civil management
under article 10.  For the reasons stated in the majority
opinion, I agree that respondent's other claims are without
merit.


Anthony N. and Richard TT.

In Anthony N. and Richard TT. the majority has
effectively overruled, in part, Matter of State of New York v
Donald DD. (24 NY3d 174 [2014]).  The majority states that Donald
DD. did not mandate a finding of a sexual disorder (majority op.
at 31 n 8, 42).  This interpretation is not supported by our
holding in Donald DD. that a sole diagnosis of ASPD, together
with evidence of sexual crimes, could never serve as the basis
for a finding of mental abnormality under article 10.  The Court
explained, "[t]he problem is that ASPD establishes only a general
tendency toward criminality, and has no necessary relationship to
a difficulty in controlling one's sexual behavior" (Donald DD.,
24 NY3d at 191).  If the majority's current view accurately
reflected the Court's analysis in Donald DD., the dissent would
not have criticized the Court for essentially redefining "mental
abnormality" under article 10.  The dissent maintained that the

Court "equate[d] a 'congenital or acquired condition, disease or disorder' with a 'mental abnormality'" (24 NY3d at 194 [Graffeo, J., dissenting]).  As a result, the Court "implicitly inject[ed] a requirement that the underlying disorder be 'sexually-related' into Mental Hygiene Law § 10.03(i)" (id. at 196).  The Court did not reject this interpretation of its analysis.  In fact, there is no response to the dissent on this point at all.  Instead, the Court doubled-down, quoting approvingly respondent's counsel that "ASPD is 'not a sexual disorder'" (id. at 190).  Even the state's expert in Donald DD., and the expert in the companion case of Matter of the State of New York v Kenneth T., acknowledged that ASPD did not predispose a person to commit conduct constituting a sex offense (id.).  Since there is no basis to overrule Donald DD., we are bound by its reasoning and holding.

Turning to the appeals in Anthony N. and Richard TT., the Court must determine whether a BPD diagnosis falls on the Shannon S. or the Donald DD. side of the line we have drawn between a diagnosis that serves as a predicate for civil management, and one that does no more than identify general criminality. In my opinion, a BPD diagnosis raises the same concerns associated with ASPD that we found dispositive in Donald DD.  Like ASPD, BPD is prevalent among the prison population, with some studies suggesting that 25% to 50% of prisoners suffer from BPD (Randy Sansone & Lori Sansone, Borderline Personality

and Criminality, 10 (6) Psychiatry, 17 [2009]; see Donald DD., 24 NY3d at 189-190).  Admittedly both are a class of personality disorder, although BPD is somewhat different from ASPD, because impulsivity is a central characteristic of BPD, and may include manifestations of sexual impulsivity.  However, a BPD diagnosis does not require sexual impulsivity expressed by behaviors constituting sexual offenses.  In fact, the DSM-5 does not associate BPD with sex-offending conduct.

In Anthony N., one of the State's experts, Dr. Lord, testified that a BPD diagnosis does not mean that a person has a mental abnormality, and the other State expert, Dr. Thomassen, explained that BPD is not a common diagnosis for sex offenders, so he looked for a linkage between BPD and the risk of reoffending.  The experts basically pathologized battering, upon which they based their diagnoses.[1]

Dr. Lord concluded that Anthony N.'s mental abnormality was evidenced by his belief that he was entitled to sex on demand and his history of relationships and sexual offenses.  Dr. Lord testified that he diagnosed Anthony N. with BPD because of his displays of emotional instability, impulsivity and irritability,

---

[1] Of course a batterer could suffer from a mental abnormality as defined by article 10.  However, the fact that a sex offender batters the offender's partner, by itself, does not convert a criminal act into a predicate "condition, disease or disorder" for a mental abnormality, nor satisfy the statutory requirement that the offender has "serious difficulty in controlling" sex offending conduct (Mental Hygiene Law § 10.03 [i]).

often to the point of violence.  Dr. Lord added that Anthony N. has serious difficulty in controlling his behavior, as evidenced by his recurring sexual offenses "despite many interventions with the legal community."

According to Thomassen, Anthony N. has a

"desperate need to have some relationship or contact with women to which he is connected or wishes to have connection.  And in his particular case, that contact appears to need to be sexual, at least some cases. There's consistent evidence in the record of him offending against his -- well, having forced sex against his paramours."

He further concluded that Anthony N. "having forced sex against his paramours" was a sound basis to find a predisposition to act on a sexual urge.

In Richard TT., the State's expert, Dr. Peterson, testified that it was the combination of BPD with respondent's two other disorders, ASPD and psychopathy, that predisposed him to commit sex offenses and impacted his impulse control.  The expert relied on what she considered to be the result of the combined impact of the three diagnoses, which individually were insufficient to establish respondent's predisposition to commit sex offenses.  However, there is no support for her "combination diagnosis" theory.

Thus, in order to connect BPD to uncontrollable sexual behavior that constitutes a sex offense, the experts in these cases relied on respondents' past crimes.  However, under article 10, a finding of mental abnormality cannot be based solely on

evidence of the commission of past sex offenses (Mental Hygiene Law § 10.07 [d]).  Article 10 "essentially envisions a battle of the experts to determine whether the respondent has a mental abnormality" (Floyd Y., 22 NY3d at 105-06 [citations omitted]), and because the basis of experts' conclusions "inevitably involve devastating accusations," convictions for sex crimes, as well as the concomitant victim-witness statements, "[j]uries may be predisposed to doubt the convicted sex offender and believe the State's expert" (id.).  It is not enough that an expert looks at a respondent's crimes and then works backwards to explain the existence of a mental abnormality.  This process easily lends itself to misdiagnoses, and increases the risk of over commitment and a greater focus on public safety by incarceration than offender treatment and care through civil management (see Crane, 534 US at 412; Hendricks, 521 US at 372-373 [Kennedy, J., concurring]; Shannon S., 20 NY3d at 108-109).

In my opinion, respondents' criminal records and the expert testimony presented in their cases were insufficient to establish they suffer from a mental abnormality as defined by article 10, and within the constitutional limits delineated by the United States Supreme Court.  To be clear, respondents have committed horrendous acts, but the existence of a mental condition is necessary to distinguish them "from the dangerous but typical recidivist convicted in an ordinary criminal case", (Crane 534 US at 413), and to justify what may end up as

permanent civil confinement.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

For Case No. 106: Order affirmed, without costs. Opinion by
Judge Pigott. Chief Judge DiFiore and Judges Rivera,
Abdus-Salaam, Stein and Garcia concur, Judge Rivera in a separate
concurring opinion. Judge Fahey took no part.

For Case No. 107: Orders affirmed, without costs. Opinion by
Judge Pigott. Chief Judge DiFiore and Judges Abdus-Salaam, Stein
and Garcia concur. Judge Rivera dissents in an opinion. Judge
Fahey took no part.

For Case No. 108: Order affirmed, without costs, and certified
question answered in the negative. Opinion by Judge Pigott.
Chief Judge DiFiore and Judges Abdus-Salaam, Stein and Garcia
concur. Judge Rivera dissents in an opinion. Judge Fahey took
no part.

Decided July 5, 2016